|  |  |  |
|---|---|---|
| TERE VILLAMIL AND VILLA COMPONETES, INC., DBA as LA JOLIE SALON AND SPA | : : : : | Civil Action No.: 17-1566 (FLW) |
| Plaintiffs, | : | **OPINION** |
| v. | : : | |
| SENTINEL INSURANCE COMPANAY, LIMITED., *et. al*. | : : : | |
| Defendants. | : : | |

**WOLFSON, United States District Judge**:

This matter comes before the Court on the Motion for summary judgment by Defendants Sentinel Insurance Company, Limited ("Sentinel") and The Hartford Financial Insurance Company's (cumulatively, "Defendants") on insurance coverage claims asserted in the Complaint of Plaintiffs Tere Villamil ("Ms. Villamil") and Villa Components, Inc. d/b/a/ La Jolie Salon and Spa ("La Jolie") (cumulatively, "Plaintiffs"). The instant dispute arises from Defendants' denial of Plaintiffs' insurance claim in connection with damages caused as a result of a storm which occurred in the Princeton, New Jersey, area on July 30, 2016. For the reasons set forth below, Defendants' Motion is **GRANTED**.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Sentinel issued an insurance policy, *i.e.*, the "Hartford Spectrum Business Insurance Policy" ("the Policy"), to La Jolie, a beauty salon located at the intersection of Witherspoon and Hulfish Streets, in Princeton, New Jersey, for the period from June 15, 2016 to June 15, 2017. Sentinel's Statement of Undisputed Facts ("Defs.' Statement of Facts"), ¶¶ 1-2. La Jolie occupies two floors in the Hulfish Building. *Id.* ¶ 3, Exhibits E & F. A descending stairwell, enclosed by

three concrete walls, leads to La Jolie's lower floor, which is below the street level and accessible through a glass door entrance. *Id.* ¶ 26, Exhibit H. Moreover, a landing area with a drain inlet is located at the bottom of the stairwell; the stairwell, however, is not protected by a roof and "is subject to direct entry of rains, snow and all elements." *Id.*

The Policy's terms and provisions, in relevant part, obligate the insurer to provide coverage for the "physical loss of or physical damage to Covered Property" that is "caused by or resulting from a covered Cause of Loss." *Id.* ¶ 21. Specifically, Covered Property and Cause of Loss are defined pursuant to the Agreement to include:

> 1. Covered Property
>
> b. Business Personal Property located in or on the building(s) described in the Declarations at the "scheduled premises" or in the open (or in a vehicle) within 1,000 feet of the "scheduled premises," including:
>
> (1) Property you own that is used in your business;
> (2) Tools and Equipment owned by your employees, which are used in your business operations
> (3) Property of others that is in your care, custody or control; [and]
> (4) "Tenant Improvements and Betterments"
>
> 3. Covered Cause of Loss
>
> Risks of Direct Physical Loss unless the loss is
> a. Excluded in Section B., Exclusions
> b. Limited in Paragraph A.4 Limitations; that follow.

*Id.* ¶ 21, Exhibit A.

However, the Policy's terms and provisions do not provide coverage for damage or loss arising from "[f]lood, including the accumulation of surface water" or "[w]ater that backs up from a sewer or drain"; indeed, as the Policy sets forth: "[s]uch loss or damage is excluded regardless of [whether] any other [covered] cause or event . . . contributes concurrently or in any sequence to

the loss." *Id.* ¶ 22, Exhibit S. Notwithstanding that exclusion, the Parties entered into a seperate

"STRETCH" agreement, which modifies the contract to include additional coverage for various

forms of physical loss or physical damage, including those arising from:

> 17. Sewer and Drain Back Up
>
> The following Additional Coverage is added:
>
> We will pay for direct loss of or physical damage to Covered Property solely caused by water that backs up from a sewer or drain. This coverage is included within the Covered Property Limits of Insurance.
>
> **THIS IS NOT FLOOD INSURANCE**
>
> We will not pay for water or other materials that back up from any sewer or drain when it is caused by any flood. This applies regardless of the proximity of the flood to Covered Property.
> Flood includes the accumulation of surface water, waves, tides, tidal waves, overflow of steams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer drain system.

*Id.* ¶ 23, Exhibit Q.

During the policy period, on July 30, 2016, a severe thunderstorm, estimated to constitute

a two hundred to five hundred year storm, resulted in approximately five to seven inches of rain

within a two-hour period.[1] *Id.* ¶¶ 4, 5-7. As a consequence, water pooled at the bottom of the

stairwell which is next to La Jolie's lower floor entrance, and subsequently, the water leaked

through the building's glass door entrance, causing the building to sustain damages. *Id.* ¶¶ 12-13.

On the day after the storm, Ms. Villamil telephoned Sentinel to report an insurance claim and

provided the following explanation to a representative:[2]

---

[1]     Although Plaintiff disputes this fact on the basis of relevancy, the infrequency of the storm speaks to its intensity, which clearly pertains to the instant dispute.

[2]     Plaintiff attempts to clarify the conversation through Ms. Villamil's subsequent deposition testimony, during which she stated as follows: "[w]e saw the [lower level] drain starting to bubble and slowly rise with water," on the day of the storm, and that the water subsequently entered the

Thank you for calling The Hartford, this is Christina, how may I help you?

Tere Villamil: Hi, yes, this is Tere Villamil, I'm calling from La Jolie Salon & Spa in Princeton, uh, we have had a flood in our lower level yesterday that was quite awful, actually. I'll send you a video. Um, and the first floor was damaged of the business and I need to put in a claim. I also put in a claim with the landlord as well.

Christina: New Jersey, ok. And when did this flood happen?

Tere Villamil: Yesterday. Uh, we were there the entire day trying to clean it all up. I sent the email and a notice to my agent, but I was in the middle of cleaning so I never called you. I called the landlord first.

Christina: Oh, okay.

Tere Villamil: Yesterday's um extreme rain that we got in two hours that was incredible.

Christina: Ok, thank you very much. And you said it was uh a flooding, correct?

Tere Villamil: Yes, uh, the water came in within 15 minutes, the water came in and flooded the entire lower level.

Christina: Oh, that's quite a bit, ok.

Tere Villamil: Yeah. It came through the door, it seeped right through the door. And if you could provide me with an email, I have videos and pictures of the entire incident.

Christina: Ok, and just uh, and just to check, I'm so sorry, did you have a separate flood insurance as well?

Tere Villamil: Uh, I don't believe so because we never had a flood there. So, I don't know if the landlord does, but, I don't have any flood insurance.

*Id.*

---

premises through the glass door. Plaintiff, nonetheless, does not dispute the recording of the telephone call between Ms. Villamil and a representative of the insurance company. Pls.' Response to Statement of Material Facts ("Pls.' Response"), ¶ 14.

Defendants ultimately denied Plaintiffs' insurance claim on the basis "that the cause of loss was a flood," which is not covered under the provisions of the Policy or Stretch agreement. Pls.' Response, ¶ 19. In that regard, (1) the manner in which the water accumulated at the base of the salon's stairwell; (2) and whether that water constitutes "surface water" are disputed on this motion. Indeed, as the basis for denying coverage, Defendants maintain that heavy rain flooded areas in Princeton, including the intersection of Hulfish and Witherspoon Street, at which corner the Hulfish Building is located. *Id.* ¶¶ 4, 11. Exhibit D. Moreover, Defendants posit that the flood water flowed over the curb and accumulated at the bottom of the stairwell which led to the lower level, prior to entering the premises through the glass door, notwithstanding Plaintiffs' efforts to block it with partially filled garbage bags from the inside of the building. *Id.* ¶¶ 12-13, Exhibit J.

Plaintiffs, on the other hand, contend that the water which entered through the lower level of the premises does not constitute flood water. Plaintiffs' Response, ¶ 13. Rather, as a consequence of the storm, Plaintiffs maintain that water accumulated on the building's roof and, in turn, entered the building's drain system. Plaintiffs' Counter Statement of Facts ("Pls.' Statement of Facts"), ¶ 32. The high volume of water which entered the building's drain system created an "over-pressurization" and, as a consequence, that water "ejected through the Salon's numerous sinks and through the [Salon's] toilets," and drains. *Id.* ¶ 33. According to Plaintiffs, that water also, as opposed to the flood water from the street, accumulated at the bottom of the salon's stairwell, entered the premises, and caused the damage. Pls.' Response, ¶ 4.

Subsequent to the denial of coverage, on March 8, 2018, Plaintiffs filed the instant Complaint against Defendants, asserting claims for: (a) breach of contract; and (b) a bad faith violation. Now, Defendants move for summary judgment on the basis that Plaintiffs have failed to

demonstrate a genuine dispute of a material fact as to the issue whether surface water contributed to the damage which the building sustained on July 30, 2016. Plaintiffs oppose the Motion.

## II. DISCUSSION

### A. Standard of Review

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ .P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id*. at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary

judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

### B. Analysis

The Parties agree that a severe thunderstorm, resulting in approximately five to seven inches of rain within a two-hour period, occurred on July 30, 2016 in the Princeton area. The severity of the storm caused the street directly in front of the Hulfish Building to flood. Moreover, a pool of water ultimately accumulated at the bottom of the stairwell that provides access to La

Jolie's lower level entrance, and subsequently entered the premises through the glass door of the salon. However, the Parties dispute whether the pooled water constitutes surface water, and in turn, how water accumulated at the bottom of the stairwell.

In that regard, Defendants contend that the water, which entered the premises of the salon, resulted from an accumulation of "flood water" that is not covered under the terms of the Policy. In support, Defendants argue that Princeton's storm sewer system was overwhelmed by severe rain, which ultimately caused the street immediately outside of the Hulfish Building to flood on July 30, 2016. Def.'s Brief, at 5. According to Defendants, the flood water subsequently flowed over the curb of the street and down the stairwell, where it ultimately pooled prior to entering the premises through La Jolie's glass door. *Id*. More importantly, Defendants contend that rain water was able to form at the bottom of the stairwell as a result of the severe storm, because the "stairwell where the water collected" does not have a "roof above it and is subject to direct entry of rains, snow and all elements." Defs.' Statement of Facts, ¶ 26.

Conversely, Plaintiffs argue that the water which ultimately entered the lower floor of the salon does not constitute surface water, because it originated from the roof of the building notwithstanding the fact it was rain water. According to Plaintiffs, the roof water subsequently entered the building's drain system, the volume of which caused "over pressurization" and, in turn, water flowed back out of the sink drains, toilets, and building's drains, including the drain which is located at the bottom of the stairwell. Plaintiffs Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp. Brief"), at 2.

Indeed, Plaintiffs contends that no flood water entered the building. Plaintiffs argue that the building's pumps were equipped with backflow preventers, and, therefore, "none of the water that entered the building originated in the city's sewer system." Pls.' Response, ¶ 4. In addition,

while Plaintiffs acknowledge that the street directly outside of the Hulfish Building flooded, that water, as Plaintiffs argue, could not have accumulated at the bottom of the salon's stairwell. Pls.' Opp. Brief, at 2. In that connection, Plaintiffs aver that the street's eight-inch curb prevented the flood water from "flow[ing] over." *Id*. Accordingly, because the only water which could have entered the building was non-flood water, Plaintiffs maintain that coverage was improperly denied.

The interpretation of an insurance contract or policy is a legal question typically reserved for a court. *Sealed Air Corp. v. Royal Indemn. Co.*, 404 N.J. Super. 363, 375 (App. Div.), *certif. denied*, 196 N.J. 601 (2008). In that regard, as a general matter, "[i]nsurance policies are construed in accordance with principles that govern the interpretation of contracts; the parties' agreement 'will be enforced as written when its terms are clear in order that the expectations of the Parties will be fulfilled.'" *Memorial Properties, LLC v. Zurich American Ins. Co.*, 210 N.J. 512, 525 (2012) (quoting *Flomerfelt v. Cardiello*, 202 N.J. 432, 441 (2010)). It is, thus, a contractual principle that courts must give the policy terms their plain and ordinary meaning. *Id*. Only when a policy's language is ambiguous, may a court rely upon extrinsic or parol evidence to determine the intent of the parties; however, where the language of the contract is clear, extrinsic evidence may not be considered. *Chubb Custom Ins. Co. v. Prudential Ins. Co.*, 195 N.J. 231, 238 (2008) ("If the language is clear, that is the end of the inquiry."). Courts must not "write for the insured a better policy of insurance than the one purchased." *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 529 (1989).

Moreover, to establish insurance coverage, the insured, such as Plaintiffs, "bears the initial burden of showing that the harm [claimed] . . . falls within the scope of the policy." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 110 (3d Cir. 2009); *Reliance Ins. Co. v. Armstrong World Indus., Inc.*, 292 N.J. Super. 365, 377 (App. Div. 1996) (burden is on the insured

"to bring the claim within the basic terms of the policy"); *Hartford Acci. & Indem. Co. v. Aetna Life & Casualty Ins. Co.*, 98 N.J. 18, 26 (1984); *Cumberland County v. GSP Recycling Co.*, 358 N.J. Super. 484, 503 (App. Div.) *certif. denied*, 177 N.J. 222 (2003); *see Building Materials Corp. of Am. v. Allstate Ins. Co.*, 424 N.J. Super. 448, 464 (App. Div. 2012) (finding that plaintiff "must first establish that its claim is covered under the policy's ensuring clause."). Only if the plaintiff satisfies this burden, does the burden shift to the defendant insurance company to show that an exclusion applies. *Estate of Mehlman*, 589 F.3d at 111. Put differently, "[f]or purposes of obtaining summary judgment, [the insurer's] burden [i]s to show that, factually, plaintiff had failed to meet its prima facie case," or that "as a matter of law, [the insurer] had demonstrated the applicability of an exclusion thereby negating coverage." *Adron, Inc. v. Home Ins. Co.*, 292 N.J. Super. 463, 473 (App. Div. 1996).

Here, the Policy, in relevant part, states as follows: "[w]e will pay for direct physical loss of or physical damage to Covered Property at the premises . . . caused by or resulting from a Covered Cause of Loss." Brief in Support of Sentinel Insurance Company's Motion for Summary Judgment ("Defs.' Brief"), Exhibit Q. Moreover, while the Policy, itself, does not cover damages which arise from "[w]ater that backs up from a sewer or drain," the Parties entered into an additional Stretch agreement. The "terms and conditions of the [P]olicy" are applicable to the Stretch Agreement; however, the Stretch Agreement obligates Defendants to provide additional coverage, including:

> **Sewer and Drain Back Up**
>
> We will pay for direct physical loss of or physical damage to Covered Property *solely* caused by water that backs up from a sewer or drain. This coverage is included with the Covered Property Limits of Insurance.

**THIS IS NOT FLOOD INSURANCE**

> We will not pay for water or other materials that back up from any sewer or drain when it is caused by any flood. This applies regardless of the proximity to the flood to Covered Property. Flood includes the accumulation of surface water, waves, tidal waves, overflow of streams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer or drain system.

Brief in Support of Sentinel Insurance Company's Motion for Summary Judgment ("Def.'s Brief"), Exhibit Q (emphasis added).

Notably, Plaintiffs do not argue that this provision is somehow ambiguous, or that it should be voided. Based on the plain and unambiguous language of the agreement which must be enforced, to acquire coverage, Plaintiffs must show that the salon sustained damages "*solely*" from water that backed up from a sewer or drain. *See, e.g., Memorial Properties, LLC v. Zurich American Ins. Co.*, 210 N.J. 512, 525 (2012) ("Insurance policies are construed in accordance with principles that govern the interpretation of contracts; the parties' agreement will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled.") (citation and quotation marks omitted). Stated differently, Plaintiffs bear the initial burden of demonstrating that flood water did not, in any way, contribute to the damages which the building sustained. *Md Retail Corp. v. Guard Ins. Grp.*, No. 2017 U.S. Dist. LEXIS 44996, at *27 (D.N.J. March 27, 2017) ("New Jersey law is clear that the plaintiff bears the burden of establishing that a loss occurred within the coverage of the insurance contract before the burden shifts to the insurer regarding the applicability of any exclusions.") (citing *Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.*, 98 N.J. 18, 483 (N.J. 1984)).

To carry such a burden, Plaintiffs rely on the expert opinions of Jack West ("Mr. J West"), Robert West ("Mr. R. West"), and Michael Melleski ("Mr. Melleski").[3] However, notwithstanding the explanations provided in those reports, the Court finds that the expert opinions do not refute that the water which accumulated at the bottom of the stairwell, at a minimum, included surface water which subsequently entered the premises through the salon's glass door.

First, Mr. J. West, the borough engineer, provided an opinion as to the cause of the disputed water damage in a three-sentence email. That email addresses the flood water on the street outside of the Hulfish Building and the drain which is located at the bottom of the stairwell, leading to the salon's lower level entrance:

> Based on my inspection of the site on [A]ugust 10, 2016, and the pictures you showed me it appears that the water damage in your building was not created by flooding from the street. From what you described the floor drain in your exterior [stairwell] appears to have failed causing water to backup into your building. Should you have any questions do not hesitate to call.

Pls.' Opposition Brief, Exhibit C. Moreover, in a deposition, Mr. J. West further explained the opinion which he rendered in his email:

> Q: Okay. And what was the cause for the flooding, based upon your understanding and the limited information that you had?
>
> A: It appears that it was from a—either a clogged or undersized drain in the stairwell.
>
> Q: Were you ever able to determine if the drain was clogged?
>
> A: No.
>
> Q: Now, that drain in the stairwell, do you know where it leads?
>
> A: No.
>
> …
>
> Q: Okay. Was another possibility—and tell me if you didn't think of this or not, you know, just let me know—that the

---

[3] While I am considering the expert reports, I, nonetheless, question the methodologies and conclusory nature of those reports upon which Plaintiffs rely, and whether they could survive a *Daubert* analysis. Indeed, Mr. J. West and Mr. R. West's reports are confined to no more than three sentences and Mr. Melleski, the remaining expert, does not practice in the field of engineering, plumbing, or any related profession. Thus, the Court questions Mr. Melleski's qualifications as an expert within this context.

flooding was—in that—well, in that area, that stairwell, was caused by the rain overwhelming the capacity of the drain?

A: Yes. That's—I had indicated that.

*Id*., Exhibit B. In sum, Mr. J. West opined that water accumulated at the bottom of the stairwell, because the intensity of the rain caused the drain to clog and cease functioning. Moreover, his explanation supports the fact that rain water also pooled at the stairwell's base, as opposed to only the water that drained from the roof, contrary to Plaintiff's position that the water that accumulated solely came from the roof through the backed up drain.

Mr. R. West also provided an expert opinion as to the cause of the disputed damage that is confined to the following two brief points:

> Rain water from the subject July 30, 2016 rain event in Princeton, New Jersey did not flow over the ground surface and enter the floor of the La Jolie Salon and Spa located at 4 Hulfish Street in Princeton, New Jersey 08540.
>
> The rain water from the July 30, 2016 event entered the La Jolie Salon and Spa from a pressured flow of pipe contained water welling into the lower floor space of the subject property.

*Id*., Exhibit I. Furthermore, during a deposition which took place on February 20, 2018, Mr. R. West stated:

> Q: Let me ask it another way. When it rains, does it rain into this area [the descending stairwell which leads to La Jolie's lower level entry]?
>
> A: Yes, it would [rain] into this area because the opening that creates the stairwell would allow water to enter that area.
>
> …
>
> Q: Okay. You're not saying that there was no water from this rain event that entered into this drain in this lower level . . . right? You're not saying that?
>
> A: I'm saying that water backed up that drain causing a level that's reported in the Ruggles as 2 feet.
>
> Q: I understand.
>
> A: In addition, water coming up from the sky landed on top of that backed up water, adding to that level.

*Id.*, Exhibit Y. Thus, Mr. R. West opined that the water which accumulated at the bottom of the stairwell consisted, at a minimum, of water which welled out of the lower level drain in addition to rain water that fell directly into that area.

Third, Mr. Melleski, a public insurance adjuster, similarly explained that the cause of loss resulted from a blockage in the drain system: "the water that damages your client's occupied space came from the reverse flow under pressure due to a blockage in the drain system. The building has a combined plumbing system that receives storm water and sewage water and then is pumped into the city's sewer system. The pumps were actively trying to pump the water out to the sewer until an over pressurization occurred and set the water in a reverse direction." According to Mr. Melleski, the damages were sustained, at least in part, by an over pressurization of the drain system.

Here, drawing every favorable inference from the expert reports, the Court finds that the entry of summary judgment is, nevertheless, appropriate. To the extent that the water from the roof of the building can be categorized as non-flood water[4] and some of that water eventually pooled at the bottom of the stairwell, Plaintiffs' experts are either silent on the issue, or admit, that the water which accumulated in that area included flood water. Indeed, as defined under the policy, flood "includes the accumulation of surface water," which the Third Circuit has defined as: "waters on the surface of the ground, usually created by rain or snow, which are of a casual or vagrant character, following no definite course and having no substantial or permanent existence." *T.H.E. Ins. Co. v. Charles Boyer Childrens Trust*, 269 Fed. Appx. 220, 222 (3d Cir. 2008). In that

---

[4] Plaintiffs rely on the testimony of Defendants' 30(b)(6) witness that water which came from the roof is not surface water. Defendants dispute Plaintiffs' interpretation of that witness's testimony. I need not make a legal determination on this issue, however, since even assuming that roof water that enters a drain is not "surface water" as defined under the Policy, I still find that summary judgment in favor of Defendants is appropriate. Accordingly, for the purposes of this motion only, the Court assumes, but does not hold, that water which lands on a roof is not "surface water" pursuant to the Policy.

connection, the Parties do not dispute that the stairwell which leads to the building's lower level entrance is not covered "by a roof and is subject to direct entry of rains, snow and all elements[,]" such as the thunderstorm which occurred on July 30, 2016. Defs.' Statement of Facts, ¶ 26. Moreover, the intense rain—falling at a rate of approximately five to seven inches within a two-hour period—landed on the exposed steps and area at the bottom of the stairwell and became surface water. In fact, Plaintiffs' own expert, Mr. R. West, acknowledged that the pooled water consisted of an accumulation of both rain water and water which backed up from the drain. Thus, even if the Court presumes that non-flood water backed up from the lower level drain, the water which ultimately entered the building also included an accumulation of flood water. As such, the expert reports do not support the fact that the damages which the salon sustained were solely the result of an accumulation of non-flood water.

Aside from the plain language of the Stretch agreement, the applicable anti-concurrent and anti-sequential provision of the Policy provides the proverbial final nail in the coffin as to Plaintiffs' insurance coverage claim. Indeed, the first page of the Stretch agreement clearly indicates that, "[e]xcept as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below." Defs.' Brief, Exhibit Q. That statement incorporates the main Policy's anti-concurrent and anti-sequential provision into the Stretch agreement, which provides:

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

Defs.' Brief, Exhibit A. Similar anti-concurrent and anti-sequential provisions are routinely enforced by courts in New Jersey, and, as applied to this case, function to exclude all coverage for a loss occasioned by a flood, even when a flood acts concurrently or sequentially with a covered

peril, such as sewer back up. *Jacobsen v. Hartford Ins. Co. Flood & Home (Sandy)*, No. 14-3094, 13-6910, 13-7160, 2017 U.S. Dist. LEXIS 52591, at *32 n.17 (D.N.J. March 31, 2017); *Lam Investment Research, LLC v. Pub. Serv. Mutual Ins. Co.*, No. 12-5576, 2016 U.S. Dist. LEXIS 45116, at *4 (D.N.J. April 1, 2016); *Assurance Co. of Am., Inc. v. Jay-Mar, Inc.*, 38 F. Supp. 2d 349, 354 (D.N.J. 1999); *Petrick v. State Farm Fire & Cas. Co.*, No. L-43-07, 2010 N.J. Super. Unpub. LEXIS 1964, at *7 (App. Div. Aug. 13, 2010); *Ashrit Realty LLC v. Tower Nat'l Ins. Co.*, No. A-1647-13T4, 2015 N.J. Super. Unpub. LEXIS 107, at *5 (App. Div. Jan. 20, 2015) (citing *Simonetti v. Selective Ins. Co.*, 372 N.J. Super. 421, 699 (App. Div. Oct. 15, 2004)).

Plaintiffs do not argue that the anti-concurrent and anti-sequential provision, here, is ambiguous or in violation of New Jersey public policy. Rather, Plaintiffs cite various non-binding cases in which anti-concurrent and anti-sequential provisions were not enforced, including *Lam Inv. Research, LLC v. Public Serv. Mut. Ins. Co.*, No. 12-5576, 2016 U.S. Dist. LEXIS 45116 (D.N.J. April 1, 2016); *Somerset Indus. v. Lexington Ins. Co.*, 639 F. Supp. 2d 532 (E.D. Pa. 2009); and *Bishops, Inc. v. Penn Nat'l Ins*, 984 A.2d 982 (Pa. Super 2009). However, the cases upon which Plaintiffs rely are readily distinguishable from the instant dispute.

In *Lam*, the court dealt with an anti-concurrent and anti-sequential provision in the context of "efficient proximate cause,"[5] which clearly does not apply in the current policy. Rather, the Policy, here, involves an addendum agreement, *i.e.*, Stretch, that specifically excludes coverage when damage arises from a sewer or drain backup that is, at least in part, caused by flood. The court, in *Bishops*, *Inc*., similarly declined to enforce an anti-concurrent and anti-sequential provision in an insurance agreement that did not provide coverage for flooding, because the parties,

---

[5]     "The 'efficient proximate cause' approach has generally found coverage where the covered risk was 'either the first or last step in the chain of causation which leads to the loss.'" *Lam Inv. Research, LLC*, 2016 U.S. Dist. LEXIS, at *11.

in that case, entered into a separate agreement which provided additional coverage for sewer and drain back up; however, unlike the Stretch agreement here, the additional agreement "ma[d]e no effort to restate the language that bars coverage on the ground of concurrent causation by another excluded cause of loss." *Bishops, Inc.*, 984 A.2d at 991. Finally, in *Somerset Indus.*, the parties' insurance agreement, there, provided coverage for "water that back[ed] up from a sewer or drain," and the plaintiffs paid an additional premium to remove a flood and surface water exception which originally applied to the insurance agreement. Therefore, upon the payment of the additional premium, the court found that the agreement's "concurrent loss clause" did not apply to damages that were caused by covered and non-covered losses.

Unlike *Lam Inv. Research* and *Bishops*, *Inc.*, the Policy's anti-concurrent and anti-sequential provision is clearly applicable. Indeed, the Stretch agreement explicitly states that "the terms and conditions of the policy apply to the insurance stated below," including its sewer and drain back up provision. Moreover, unlike *Somerset Indus.*, Plaintiffs, here, did not pay an additional premium to remove the Policy's flood and surface water exception. To the contrary, the Stretch agreement's sewer and drain back up provision provides additional coverage for damages which "solely" arise from non-flood water that backs up from a sewer or drain. In fact, that provision specifically states that "THIS IS NOT FLOOD INSURANCE," and that Defendants "will not pay for water or other materials that back up from any sewer or drain when it is caused by any flood." Accordingly, because both the Stretch agreement and the anti-concurrent and anti-sequential provision exclude coverage for any damages from a drain and sewer backup caused by flood water, and because Plaintiff has failed to raise a genuine issue of material fact that flood water, indeed, entered the building, summary judgment is granted in favor of Defendants.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for summary judgment is **GRANTED**.


/s/ Freda L. Wolfson
Freda L. Wolfson
United States District Judge